## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **TANISHA MOORE  AND** | § | |
| **DESTINY CEASAR** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Case No. 4:23-cv-03048** |
| | § | |
| **OFFICER DARYL HUDECK, OFFICER JAIME** | § | |
| **VARGAS,  OFFICER SEAN MCCREARY,** | § | **JURY TRIAL DEMANDED** |
| **OFFICER ERIK HOLLAND, OFFICER BRANDON** | § | |
| **HOLLIS, OFFICER TONY VILLA,** | § | |
| **OFFICE CHARLES DEXTER, OFFICER JESSE** | § | |
| **SEAY, OFFICER MARCO LOPEZ, OFFICER** | § | |
| **CAMERON OVERSTREET, CITY OF HOUSTON,** | § | |
| **AND JOHN DOE** | § | |
| **Defendants.** | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT
## UNDER CIVIL RIGHTS ACT, 42 U.S.C. § 1983

COMES NOW, Tanisha Moore, Plaintiff is the above-styled and numbered cause and files this action pursuant to 42 U.S.C. § 1983 and the Texas Wrongful Death and Survivorship Statute against Defendants, City of Houston Police Officers Daryl Hudeck, Officer Jaime Vargas, Officer Sean McCreary, Officer Erik Holland, Officer Brandon Hollis, Officer Tony Villa, Officer Charles Dexter, Officer Jesse Seay, Officer Marco Lopez, Officer Cameron Overstreet and Officer John Do for excessive use of deadly force in violation of Dexter Ceasar's constitutional rights, bystander liability, and conspiracy. The actions and conduct of the Defendant officers are the result of a policy, practice, custom, and deliberate indifference on the part of the defendant the City of Houston. In support of this claim, Plaintiff would show as follows:

## JURISDICTION AND VENUE

1.  Jurisdiction exists in this court pursuant to 28 U.S.C. §§ 1331 and 1343 as this action is

brought under, inter alia, the Fourth Amendment of the United States Constitution and 42 U.S.C. §1983, to redress the deprivation of rights, privileges and immunities guaranteed to decedent Dexter Ceasar, by constitutional and statutory provisions. Plaintiff further invokes the supplemental jurisdiction of this court pursuant to 28 U.S.C. § 1367 to adjudicate pendent claims arising under the laws of the State of Texas.

2.   Venue is proper in this court because the causes of action occurred within the Southern District of Texas.

## PARTIES TO THE SUIT

3.   Plaintiff, in this case, is Tanisha Moore, a resident of Houston, Harris County, Texas. She was the mother of the decedent, Dexter Ceasar and brings this suit. The last three digits of her Social Security Number are 184.

4.   Plaintiff, Destiny Ceasar is a resident of Houston, Harris County. She is the twin sister of Dexter Ceasar and brings her individual state law claims for intentional infliction of emotional distress.

5.   Defendant, Daryl Hudeck, is an officer with the Houston Police Department, sued individually and has made an appearance. The officer defendant was acting under the color of law in his individual capacity as an HPD officer. Hudeck was acting within the course and scope of his duties as an officer for the City of Houston Police Department. At all relevant times, the officer defendant was acting with complete authority and ratification of their principal, Defendant City of Houston.

6.   Defendant, Jaime Vargas, is an officer with the Houston Police Department, sued individually and has made an appearance. The officer defendant was acting under the color of law in his individual capacity as an HPD officer. Vargas was acting within the course and scope of his duties

as an officer for the City of Houston Police Department. At all relevant times, the officer defendant was acting with complete authority and ratification of their principal, Defendant City of Houston.

7.     Defendant, Sean McCreary is an officer with the Houston Police Department, sued individually and has made an appearance. The officer defendant was acting under the color of law in his individual capacity as an HPD officer. McCreary was acting within the course and scope of his duties as an officer for the City of Houston Police Department. At all relevant times, the officer defendant was acting with complete authority and ratification of their principal, Defendant City of Houston.

8.     Defendant, Erik Holland is an officer with the Houston Police Department, sued individually and has made an appearance. The officer defendant was acting under the color of law in his individual capacity as an HPD officer. Hollis was acting within the course and scope of his duties as an officer for the City of Houston Police Department. At all relevant times, the officer defendant was acting with complete authority and ratification of their principal, Defendant City of Houston.

9.     Defendant, Brandon Hollis is an officer with the Houston Police Department, sued individually and has made an appearance. The officer defendant was acting under the color of law in his individual capacity as an HPD officer. Hollis was acting within the course and scope of his duties as an officer for the City of Houston Police Department. At all relevant times, the officer defendant was acting with complete authority and ratification of their principal, Defendant City of Houston.

10. Defendant, Tony Villa is an officer with the Houston Police Department, sued individually and has made an appearance. The officer defendant was acting under the color of law in his individual capacity as an HPD officer. Villa was acting within the course and scope of his duties as an officer for the City of Houston Police Department. At all relevant times, the officer defendant was acting with complete authority and ratification of their principal, Defendant City of Houston.

11.     Defendant,  Charles Dexter is an officer with the Houston Police Department, sued individually and has made an appearance. The officer defendant was acting under the color of law in his individual capacity as an HPD officer. Dexter was acting within the course and scope of his duties as an officer for the City of Houston Police Department. At all relevant times, the officer defendant was acting with complete authority and ratification of their principal, Defendant City of Houston.

12. Defendant, Jesse Seay is an officer with the Houston Police Department, sued individually and has made an appearance. The officer defendant was acting under the color of law in his individual capacity as an HPD officer. Seay was acting within the course and scope of his duties as an officer for the City of Houston Police Department. At all relevant times, the officer defendant was acting with the complete authority and ratification of their principal, Defendant City of Houston.

13.     Defendant, Marco Lopez is an officer with the Houston Police Department, sued individually and who may be served at the Department Headquarters at 1200 Travis St., Houston, Texas 77002. The officer defendant was acting under the color of law in his individual capacity as an HPD officer. Lopez was acting within the course and scope of his duties as an officer for the City of Houston Police Department. At all relevant times, the officer defendant was acting with the complete authority and ratification of their principal, Defendant City of Houston.

14.     Defendant, Cameron Overstreet is an officer with the Houston Police Department, sued individually and who may be served at the Department Headquarters at 1200 Travis St., Houston, Texas 77002. The officer defendant was acting under the color of law in his individual capacity as an HPD officer. Lopez was acting within the course and scope of his duties as an officer for the City of Houston Police Department. At all relevant times, the officer defendant was acting with the complete authority and ratification of their principal, Defendant City of Houston.

15.     Defendant, the City of Houston ("City") is and was a duly organized public entity, existing under the laws of the State of Texas. City is a chartered subdivision of the State of Texas with the capacity to be sued. The City is a Texas municipal corporation that operates the Houston Police Department (the "HPD " or "Department"), which in turn sets city-wide policy for police officers employed by the Department. City is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies, including the City of Houston Police Department and its agents and employees. At all relevant times, Defendant City was responsible for assuring that the actions, omissions policies, procedures, practices, and customs of the City of Houston Police Department and its employees and agents complied with the laws of the United States and of the State of Texas. The City of Houston, Defendant is sued in its official capacity and subjected to monetary damage claims under 42 U.S. C.§ 1983 because its official policy or custom caused Mr. Ceasar, to be deprived of state and federally protected rights. At all relevant times, City was the employer of Defendant Officers. Defendant City of Houston has made an appearance in this case.

16.     John Doe, officers of the City of Houston, the identity and number of whom is presently unknown to Plaintiff.

**FACTS**

17.     On April 25, 2022, at approximately 10: 00 am the Houston Police Swat Team and Crime Suppression Team arrived at a gas station located at 7506 Martin Luther King Blvd., Houston, TX, to apprehend Dexter Ceasar for an outstanding warrant.

18.     Named Defendant officers were all present at the incident referenced in paragraph 17 and wearing body-worn cameras.

19.     When police arrived, Mr. Ceasar was sitting in the passenger side of a red car parked in front of the store's entrance to the gas station. Concrete parking bollards were placed between the

parking lot and the walkway in front of the store to prevent collisions or crashes onto the walkway or into the store.

20.     The female driver of the vehicle that Mr. Ceasar was sitting in, exited the vehicle, and walked toward the store.

21.     After the driver had exited, and while Mr. Ceasar was still calmly waiting in the passenger seat, SWAT vehicles and a Houston Police Dept. (HPD) unit frantically converged on the vehicle Mr. Ceasar was sitting in.

22.     After seeing the commotion and fearing for his safety and freedom, Mr. Ceasar moved to the driver's seat and backed the vehicle up. He then proceeded forward (but parallel to the store's walkway and entrance)--in an attempt to turn around to leave the parking lot.  Ceasar did not drive forward into the store, nor could he have run up onto the walkway or driven into the storefront due to the parking bollards.  Thus, customers and pedestrians were not in danger of being hit, nor were they in Ceasar's path.

23.     There was no immediate threat of danger or harm to anyone at the time that Mr. Ceasar was attempting to leave the parking lot. No people were immediately behind or in front of the vehicle.

24.     Mr. Ceasar did not make any verbal threats to officers, any standers by or the driver of his vehicle.

25.     Mr. Ceasar was not brandishing a weapon. He did not point one or threaten anyone with a weapon.  No person or officer was in reasonable fear for their safety, or the safety of others based on any alleged weapon, including the vehicle or a gun.

26.     As Mr. Ceasar began to turn the vehicle around, Defendant Office Jaime Vargas fired off several shots from his gun into the vehicle that was occupied by Mr. Ceasar,  The gunshot from Vargas caused the vehicle to stop.

27.     One of Defendant Officer Jaime Vargas' bullets struck Mr. Ceasar in the shoulder.

28.     As Defendant Officer Daryl Hudeck yelled for Defendant Officer Jaime Vargas to come to him, Defendant Jaime Vargas attempted to cover up his actions by shouting loudly that Mr. Ceasar "was about to hit that person over there" and pointing his finger towards the station. This was clearly a false statement because the bollards would have protected anyone on the walkway, and no person, only an unoccupied bicycle was on the path near the ca, the bollards, and the walkway from the time the cameras were enacted.

29.     Furthermore, Defendant Jaime Vargas immediately jumped to the use of deadly force by shooting at Mr. Ceasar instead of trying to shoot at the tires or use any non-lethal means to stop the vehicle.

30.     Once the vehicle stopped, the SWAT team pinned the car so that the vehicle could not escape.

31.     At this time, Mr. Ceasar was scared and called his sister and tried to engage his Facetime App; but was talking to his sister on the phone. He did not make any threats or utilize any weapons, and did not try to drive the vehicle again.

32.     SWAT officers from all directions began to yell for Mr. Ceasar to get out of the vehicle although they acknowledged that he had already been hit and was probably hurt.

33.     At one point, one SWAT officer, using the megaphone or loudspeaker, told Mr. Ceasar " We have medics here to hurt you…I mean help you."

34.     Mr. Ceasar was fearful and continued to talk to his sister on the phone. He was in pain and scared.

35.     Mr. Ceasar repeatedly asked officers if they could hear him, to which the officers responded "yes, we can hear you."

36.     Mr. Ceasar then told officers he was just on his phone talking to his sister.

37.     Officers confirmed that they saw him talking on his phone and told him to get off the phone and to exit the vehicle.

38.     Mr. Ceasar replied "Yes, sir, I'm just talking to my little sister."

39.     Defendant Officer Jesse Seay then fired off two rounds of tear gas into Mr. Ceasar's vehicle while Mr. Ceasar was on the phone with his sister.

40.      Defendant Officer Jesse Seay did not give Mr. Ceasar time to comply between the first and second rounds of tear gas.

41.     After the first round of tear gas, immediately before the second round, a still disoriented Ceasar who had told officers that he was on the phone with his sister is seen bringing the phone back to his ear as his body goes back into an upright position after his body involuntarily recoiled from the shock of the first can of tear gas.

42.     Within seconds of firing off the second can of tear gas, Defendant Officer Cameron Overstreet fired his gun into the vehicle which was still clouded with smoke.  Overstreet's bullet struck and killed Ceasar. Mr. Ceasar's body did not even have time to come back to the upright position after the second can of tear gas, or otherwise comply with the officers' commands before he was struck in the head by a bullet from Defendant Officer Cameron Overstreet's weapon.

43.     As a result of the gunshot wound to the head caused by Defendant Officer Cameron Overstreet, Mr. Ceasar died.

44.     At the time that Officer Overstreet shot Mr. Ceasar in the head, he was still on the phone with his sister, and his body had involuntarily jerked forward and back by the tear gas.

45.     At the time that Officer Overstreet shot Mr. Ceasar in the head, he was not attempting to drive the vehicle nor to escape. He is clearly seen from all angles of the vehicle with a cell phone

help up to the side of his face.

46.    At the time that Officer Overstreet shot Mr. Ceasar in the head, he was not making any threats to officers.

47.    At the time that Officer Overstreet shot Mr. Ceasar he was not making any sudden movements, other than the slow and involuntary recoil of his body from impact and shock of the tear gas that had been fired just a second earlier.

48.    At the time that the SWAT team officer shot Mr. Ceasar, he was not utilizing a weapon or pointing a weapon at any person.  Ceasar was holding a cell phone which he had already announced to officers and which they acknowledged, and which was seen on the cameras.

49.    At the time that Officer Vargas shot Mr. Ceasar in the shoulder and Officer Overstreet shot Mr. Ceasar in the head, they were not aware that a weapon had been in the vehicle at all; or to whom the weapon belonged (There had been two passengers in the vehicle).  Nor did they announce or claim that he was drawing a weapon or pointing anything at them or at himself.

50.    Again, at the time that Officer Overstreet shot Mr. Ceasar, he was aware that Mr. Ceasar was simply talking on the phone to his sister because he had told them so,  multiple Defendant Officers had observed him using a cell phone inside the vehicle and called out to each other out loudly that he was using a cell phone.

51.    At all times Mr. Ceasar was in the line of sight of officers. He never made movements to reach down or over. Ceasar was never belligerent, or disrespectful

52.    to officers.  Ceasar spoke  in a calm voice when he notified officers that he was trying to tell his little sister what was happening to him.  This was not unreasonable for someone who knew he was being arrested.

53.    Mr. Ceasar did not immediately die due to the gunshot wounds from Officer Overstreet,

but rather passed away within 24 hours of the shooting at the hospital.

54.     During the time between when Mr. Ceasar was shot and when he ultimately passed away, he suffered unspeakable pain and suffering and mental anguish as a result of the gunshot wounds inflicted on him by Officer Vargas and Officer Overstreet; as well as the fear instilled in him by the actions of the entire SWAT Team.

55.     Officers Daryl Hudeck, Sean McCreary, Erik Holland, Brandon Hollis, Tony Villa, Charles Dexter, Jesse Seay, and Marco Lopez tried to cover up the excessive use of force by claiming that Mr. Ceasar shot himself from inside the car and committed suicide.

56.     The officers on the scene violated the Houston Police Department's policies and procedure surrounding officer involved shootings by not immediately isolating the officers and preventing them from talking to each other.

57.     The Defendant Officers worked shifts together regularly and were looking out for one of their own team members by covering up the final shot as a suicide.

58.     A gun was recovered from the car, but Dexter Ceasar had not shot himself with it. Instead, the gun was a convenient cover-up for Defendant Cameron Overstreet's final shot to Dexter Ceasar's head.  There is no way of knowing where in the vehicle the gun was actually positioned in the car because of the way that the officer converged onto the vehicle after the door had been opened.

59.     Defendant Officers Daryl Hudeck, Officer Jaime Vargas, Officer Sean McCreary, Officer Erik Holland, Officer Brandon Hollis, Officer Tony Villa, Officer Charles Dexter, Officer Jesse Seay, Officer Marco Lopez, Officer Cameron Overstreet gave blatantly false statements during the investigation that Dexter Caesar had shot himself in the head, even though they knew it wasn't true.

60.     In fact, the storefront video shows that at the moment Overstreet's discharged the fatal

gunshot, Officer Sean McCreary, Officer Charles Dexter, and Officer  Jesse Seay who were positioned on the far right side of the large black SWAT shop truck,  looked in unison to their left towards Overstreet at the second he discharged his weapon.  Their sharp look in that direction told on their comrade.  They did not duck in fear of a gunshot coming from inside of the vehicle.  They did not seem to flinch when they heard the final shot—because they knew it was not coming from inside; but rather that it was aimed squarely at Mr. Ceasar's head from his left side.

61.     The storefront camera also showed that Mr. Dexter Ceaser had a cell phone in his left hand at his face.  His right hand is visibly empty.  The right hand is seen recoiling when his body does after the tear gas is shot into the vehicle.  That hand is empty.  Overstreet had no reason to shoot Ceasar.

62.     The Defendant Officers Daryl Hudeck, Officer Jaime Vargas, Officer Sean McCreary, Officer Erik Holland, Officer Brandon Hollis, Officer Tony Villa, Officer Charles Dexter, Officer Jesse Seay, Officer Marco Lopez, Officer Cameron Overstreet were all at the scene together and were able to speak with one another prior to the shooting investigation to decide to spin their own version of events that Dexter Ceasar had shot himself in the head with the gun they had later found in his vehicle when they were taking him out to get aid.

63.     Defendants Jesse Seay and Marco Lopez had just both had charges brought to the grand jury for an officer shooting investigation on April 20, 2022, just four days before this incident.

64.     Defendants Jesse Seay and Jaime Vargas had both been brought before the grand jury for officer shooting investigations on September 16, 2021.

65.     These officers were allowed to remain on the Police force even though the Houston Police department was well aware of their dangerous propensities and that they were threats to the public.  The City of Houston failed to suspend these officers or terminate them for periods of time

long enough to ensure that they were suited to return to duty.

66.     Defendant Officers have been through the investigation process before and were looking out for one of their own attempting to cover up Officer Overstreet shooting Mr. Ceasar and claiming it was a suicide. The thin blue line is a well-known phenomenon, and officers will not tell on another officer.

67.     Video footage from the gas station contradicts the officers' version of events and makes clear that Mr. Ceasar did not commit suicide but that he was shot by some member of the SWAT team; that SWAT team member, on information or belief is Defendant Officer Cameron Overstreet.

68.     The video footage from the gas station clearly shows Mr. Ceasar's body make an involuntary movement forward and even slumped; and then he recoils back after the first can of tear gas. You can see that in his right hand he has his phone and as his body is coming back up he is putting the phone back to his ear to talk to his sister. In the same frame, you can see that his left hand has come up and it is completely empty. He is not holding a gun or anything else in his left hand.

69.     The second can of tear gas is then shot and again Mr. Ceasar's body involuntarily starts to do a forward back type movement, similar to whiplash. This time before he came back up, there is a shot to his head.

70.     It is not possible that Mr. Ceasar, who had an empty left hand after the first can of tear gas, while mid-whiplash, was able to grab a weapon from someplace in the car, grab a gun and shoot himself in the head.  But there is no reason to speculate about what happened when there is video to show us what happened on that fateful morning.

71.     The original medical examination report ruled Mr. Ceasar's death a homicide by a gunshot wound from behind.

72.     In an effort to cover up the unreasonable use of deadly force by officers, the medical

examiner later amended the report to rule the death as suicide.

73.     Despite the autopsy having been conducted in April 2022, it was not signed off on by the Chief Medical Examiner and produced with an altered ruling of "suicide" until March 10, 2023. Almost a year later and just a couple of months before Defendant Officer Jaime Vargas and Defendant Officer Cameron Overstreet were brought before the grand jury for their involvement in this incident.

74.     The autopsy report noted that the entrance wound to the head showed no evidence of soot, or gunpowder stippling on the skin surrounding the entrance wound. This is significant because when a shot is at close range, particularly with a shorter barrel, like a handgun that was allegedly retrieved from Mr. Ceasar's car, you would expect to find stippling.

75.     There is no dispute that Officer Jaime Vargas shot Mr. Ceasar in the shoulder. The autopsy report similarly found no gunpowder stippling around the shoulder entrance wound. That is to be expected, because it was not a very close or tight contact shot. It was from a considerable distance using a long gun or sniper rifle.

76.     There is no indication in the autopsy report that Mr. Ceasar had gun powder on his hands or other signs that he had recently fired a gun.

77.     On June 8, 2023, both Defendant Officer Jaime Vargas and Defendant Cameron Overstreet had charges for a "shooting investigation" for this incident brought before a grand jury.

78.     The City of Houston Police Department has continued to cover for its officers and protect them by failing to be fully transparent. Specifically, the video footage that was released of Mr. Ceasar's death by the City of Houston, were select clips rather than the full video footage available. This is widespread practice for the Houston Police Department in officer involved shooting cases.

79.     Despite numerous officers wearing bodycams, and facing toward Mr. Ceasar's vehicle,

not one single bodycam video that has been released shows the final gunshot to Mr. Ceasar's head. Instead, they released a small clip from inside the convenience store that was pointing toward Mr. Ceasar. This clip has no audio and is of lower quality. However, Plaintiffs contend that it is clear enough to show us the facts.

80.    Despite the clever attempt to pick select, choice clips to share of the incident, and to spin a narrative that Mr. Ceasar committed suicide, many have not been fooled as seen by the multiple comment on the Houston Police Department's Facebook page where many commentators stated that it appeared that Mr. Ceasar was shot by an officer and that it *was not* suicide.

81.    Also noteworthy, is that despite heavily editing and making select choices in which footage to release and how much footage to release, there is not a single clip where anyone ever says anything about seeing Dexter with a weapon. The first time that Officers appear to be concerned about a gun is when they open the door and start to grab Dexter's arms to take them out. There are no warnings to one another as they are approaching the vehicle to be cautious of a gun or to watch for a gun. When they later found out (or fabricated/planted) that there was a gun someplace in the vehicle, it created a perfect opportunity for officers to cover up the wrongful death of Dexter Ceasar to protect Officer Cameron Overstreet and Jaime Vargas from criminal charges being pressed against them and to attempt to avoid any civil liability.

82.    Defendant officers were on fair notice that their conduct of shooting Mr. Ceasar when he posed no immediate danger to the officers – because he was not threatening officers with a weapon or making any threatening movements, or making any threatening statements - was unlawful and an unjustified use of force.

83.    There were clearly established rules that prohibited the use of deadly force when Mr. Ceasar was not threatening officers with a weapon, making any threatening statements, or threatening

movements. "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Tennessee v. Garner*, 471 U.S. 1, 2, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). More specifically, the Fifth Circuit has held that "it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." *Lytle v. Bexar Cnty., Texas*, 560 F.3d 404, 408 (5th Cir. 2009). *Ramos v. Taylor*, 646 F. Supp. 3d 807, 818 (W.D. Tex. 2022).

84.     Mr. Ceasar's vehicle was blocked in, and he was talking on a cell phone. He let officers know he was talking to his sister on the phone and officers acknowledged they heard him. They briefed each other on this fact.

85.     At all times, all officers were wearing their department-issued uniforms, wearing an HPD badge or insignia, armed with service weapons and acting in full capacity as officers of Houston Police Department.

86.     The Houston Police Department has a rash of police-involved shootings where officers are not disciplined.

87.     The City of Houston and the Houston Police Department have a pattern and history of condoning police officers use of deadly force in situations where the use of deadly force is not warranted.

88.     The City of Houston and the Houston Police Department have a pattern and history of condoning police officers use of excessive force against citizens.

89.     For example, just a few days later, on April 27, 2022, Houston Police Department officers were searching for Jalen Randle, a 29-year-old Black male, wanted on felony warrants. Mr. Randle was a passenger in a vehicle and was not the driver who was evading officers. Officers brought the vehicle to a stop, and when Mr. Randle, unarmed and posing no immediate threat, exited the vehicle

as instructed, Officer Shane Privette almost immediately let off one shot from his service weapon striking and killing Mr. Randle. The officers had said "let me see your hands" and never even gave Mr. Randle a chance to comply before shooting him in the neck, dragging him while handcuffed across the sidewalk and causing his death.  Officer Privette had been charged in 2017 with physically attacking another suspect and kneeing him in the face.  Yet he was allowed to remain on the force to have the opportunity to shoot and then drag Jalen Randle.

90.     In August 2015, Alan Pean, checked himself into a Houston hospital to get mental health help. He had a history of bipolar disorder and was suffering from hallucinations. An off-duty HPD officer ended up shooting Mr. Pean while he was unarmed and naked in the hospital. Later HPD tried to charge him criminally as a way to cover up the shooting. Ultimately, they failed to successfully prosecute Mr. Pean and the City of Houston settled the civil lawsuit with Mr. Pean.

91.     Houston Police Department went from a low of 15 officer shootings in 2017 to an increasing number of shootings in each successive year, with 29 officer-involved shootings in 2022, the year of Dexter Ceasar's death. At least 13 of those shootings resulted in death. At least 6 of those shootings are acknowledged by HPD as the suspect not having any weapon on them. 5 of the 29 shootings officers were responding to warrants, and of those 5, 3 resulted in death. A warrant should not equal a death sentence.

92.     In 2021, there were also 29 officer-involved shootings. At least 8 of the victims the Houston Police Depart recognizes as being unarmed persons. Only 2 of the officer-involved shootings were classified as warrant responses. Both suspects shot in response to a warrant call, died. A warrant should not be a death sentence.

93.     In 2020, there were 26 officer-involved shootings and at least 5 of the suspects, the Houston Police Department recognized as having no weapons.

94.     In 2019 there were 21 officer-involved shootings and at least 3 were recognized as having no weapons, and two "hands and feet" were the categorized weapon. In 2019 the only two victims where the call was for a warrant, both ended up killed by the officer's gunshots. Again, a warrant is not supposed to be a death sentence.

95.     An analysis in 2016 found that from 2010-2016 of 40 cases involving unarmed individuals, only five officers were disciplined.

### Destiny Ceasar

96. Destiny Ceasar is the twin sister of Dexter Ceasar. He considered her his "little sister"

97.     A nearly 8-month pregnant Destiny Ceasar was on the phone with Dexter Ceasar throughout the encounter with the Defendant Officers. Dexter Ceasar announced to officers that he was trying to tell his twin sister what was happening and that he was on the phone with her.

98.     Destiny Ceasar heard the final shot and the phone drop when Dexter was shot. She heard him telling officers that he was on the phone with his sister. His last words to her were "I love you."

99.     Destiny Ceasar was on her way to Dexter Ceasar while she was in on the phone with him. She was riding with a co-worker.

100.     Destiny Ceasar arrived at the scene before Dexter was taken into the ambulance and to the hospital.  April 25, 2022.

101.     As a result of witnessing her twin brother's death in real time, and hearing his pleas to the police she suffered extreme emotional distress that manifested itself in both physical and emotional symptoms.

102.     Destiny's distress was so great after witnessing her brother's death that she was put on bed rest just a few days after her brother was taken off of life support. She had attempted to return to

work a few days after the incident but had only been able to work for an hour or two and felt weak, had stomach cramps, and just sat in the bathroom until her manager came and got her. It was at that point she went to the doctor and was put on bed rest until she had her daughter.

103.    Not only was Destiny put on bedrest, but her water broke early, at only 33 weeks, the day before her brother's funeral service. Destiny had to remain in the hospital while her brother was laid to rest.

104.    Doctors believed that the stress from losing her brother is what caused Destiny to have to be put on bed rest and her water to break early.

105.    Destiny also suffered the following symptoms related to the murder of her brother: Memory loss, postpartum depression, anxiety, the inability to sleep, inability to focus, flashbacks, inability to maintain employment, disconnect and inability to bond with her then infant baby, and fear of the police.

106.    Dexter Ceasar was not the only victim of Defendant that day; his mother Tanisha Cobbs Moore and twin sister Destiny were also.

**PRE-SUIT DISCOVERY EFFORTS**

107.    On April 20, 2023, Plaintiff's counsel put in an open record request to obtain the full body cam footage available for this incident, along with a copy of the investigation and any forensics completed. Plaintiff also requested the first names of the officers involved. Plaintiff's counsel received a response that there was an open, inactive investigation pending grand jury and so information was withheld. Plaintiff's counsel was provided only with a heavily redacted incident report and still no first names of the officers that were there that day.

108.    Since the grand jury proceedings are now over and a no-bill was returned, Plaintiff renewed efforts to obtain the body cam footage, ballistics, witness statements, and  investigation

through an open record request on September 17, 2024. As of the date of this filing, no response has been received. Defendant City of Houston continues to try and cover up for its officers by blocking victim's access to justice and to hold its officers accountable. Plaintiff' simply wants answers for what happened to her son. If Defendant Officers did nothing wrong, it is unclear why this family is not able to see the video footage in its entirety, unedited and without further delay.

## STATEMENT OF CLAIM

**Claim Number 1**:   *Dexter Ceasar was deprived of his 4th Amendment Rights against unreasonable searches and seizures when Defendant Officers Cameron Overstreet and Jaime Vargas, used excessive deadly force to shoot Mr. Ceasar while he posed no immediate threat or danger to officers or other people and when Defendant Officer Jesse Seay deployed a second can of tear gas without adequate time for Dexter Ceasar to comply after deploying the first can of tear gas.*

109.    The 4th Amendment provides "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures…" [U.S. Constitution, Amendment 4].

110.    The use of excessive force is recognized as a violation of a person's 4th amendment right.

111.    Plaintiff incorporates by reference the foregoing and succeeding paragraphs as if set forth herein.

112.    Mr. Ceasar was seized as he was unable and not free to leave the gas station. He was surrounded by Police vehicles from all sides, officers in tactical gear, with weapons pointed at him.

113.    It is clearly established law that the use of deadly force is not justified when there is no immediate threat to officers or others. Where the suspect poses no immediate threat to the officer and

no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Tennessee v. Garner*, 471 U.S. 1, 2, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). More specifically, the Fifth Circuit has held that "it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." *Lytle v. Bexar Cnty., Texas*, 560 F.3d 404, 408 (5th Cir. 2009). *Ramos v. Taylor*, 646 F. Supp. 3d 807, 818 (W.D. Tex. 2022).

114.    At the time that Defendant Officer Jaime Vargas shot Mr. Ceasar in the shoulder, there was no reasonable belief that Mr. Ceasar was a threat to officer or others. There were no people in the vehicle with Mr. Ceasar and no one near the car when he began to drive. Defendant Officer Jaime Vargas, instead of using non-deadly force and attempting to stop the vehicle, by say, shooting at the tire, pointed his gun and Mr. Ceasar and shot him in the arm, putting Mr. Ceasar in fear of his life.

115.    At time that Defendant Officer Cameron Overstreet shot Mr. Ceasar, there was no reasonable belief that Mr. Ceasar posed a threat to officers or others. He was sitting in a car talking to his sister. Two canisters of tear gas had been blasted into the vehicle just mere seconds before he was shot. Mr. Ceasar had not even had a chance to compose himself from the tear gas.

116.    No reasonable officer would have used deadly force in this situation as Mr. Ceasar posed no threat. He was not attempting to flee at the moment he was shot nor was he acting in a threatening manner. He was on the phone talking to his sister and had been communicating the same to officers.

117.    The fact that Defendant Officer Jesse Seay had unloaded two cans of tear gas (non-lethal force) just mere seconds supports that reasonable officers would not shoot Mr. Ceasar but rather would use other non-lethal means.

118.    The unreasonable use of deadly force against Mr. Ceasar when he posed no threat, was a violation of his constitutional rights.

119.     Defendant Officer Jesse Seay also used excessive force when he shot the second can of tear gas into Dexter Ceasar's vehicle because Mr. Ceasar had not been given time to comply before the second can was deployed. It was not reasonable to deploy the second can of tear gas before seeing if the first can was adequate to gain compliance.

120.     As a result of these Constitutional violations, the unwarranted shooting and the death of Dexter Ceasar, Plaintiff seeks compensation as set forth more specifically in the section of this Complaint entitled "Damages."

121.     The misconduct and excessive force described in this claim "shocks the conscience."

**Claim Number 2:** *Plaintiffs Tanisha Moore and Desitny Ceasar's 14th Amendment rights were violated when Defendant Officers conspired to cover up the wrongful death of Dexter Ceasar*

122.     "The Fifth Circuit has held that the right of access to the courts as guaranteed and protected from unlawful interference and deprivations by the state." *Bright v. City of Killeen*, 532 F. Supp. 3d 389, 401 citing *Ryland v. Shapiro*, 708 F.2d 967, 972 (5th Cir. 1983).

123.     Plaintiff Tanish Moore has a 14th Amendment right to access the Courts and to seek recovery for the violation of Dexter Ceasar's constitutional rights and wrongful death.

124.     Plaintiff Desitny Ceasar has a 14th Amendment right to access the Courts and seek recovery for the negligent infliction of emotional distress caused to her by the use of deadly force against her brother Dexter Ceasar.

125.     When Defendant Officers Daryl Hudeck, Officer Jaime Vargas, Officer Sean McCreary, Officer Erik Holland, Officer Brandon Hollis, Officer Tony Villa, Officer Charles Dexter, Officer Jesse Seay, Officer Marco Lopez, Officer Cameron Overstreet conspired together to cover up the use of deadly force against Dexter Ceasar by claiming in statements made during the investigation that Dexter Ceasar had shot himself, even though they were aware that was not true, because they were at the scene, they were attempting to prevent criminal charges being pressed against a fellow

officer, and civil liability for the wrongful death of Mr. Ceasar. These actions interfered with Plaintiff's ability to access the Court and seek recovery, which is a violation of Plaintiff's 14th Amendment rights.

126.   Defendants' actions to conspire together to obstruct justice and to deny Plaintiffs access to the Court were for the Defendants' own personal purpose of helping protect one of their own. Their actions were outside the scope of their employment because their actions (tampering with an investigation by making false statements) were unauthorized. When actions are for personal purposes or outside the scope of employment the intracorporate conspiracy doctrine does not apply *Bright v. City of Killeen*, 532 F. Supp. 3d 389, 402.

**Claim Number 3:** *Failure to Train and/or Implement and/or Supervise Proper Policies and Procedures (Defendant City of Houston and Houston Police Department)*

127.   Plaintiff incorporates by reference the foregoing and succeeding paragraphs as if set forth herein. Plaintiff would show that prior to April 24, 2022, the Houston Police Department knew or should have known that Defendants exhibited a pattern of escalating encounters with the public.

128.   Defendants and other officers at the scene of the shooting incident were acting under the color of law and pursuant to customs, practices, and policies of the City of Houston and the HPD in regard to the use of deadly force as authorized and/or ratified by the Policymakers.

129.   Dexter Ceasar was deprived of rights and privileges secured to him by the United States Constitution and by other laws of the United States, by the City of Houston failing to provide proper training, adequately supervise, and/or discipline its officers in dealing with individuals such as Dexter Ceasar, in violation of 42 U.S.C. §1983 and related provisions of federal law and in violation of -the above-cited constitutional provisions.

130.    With respect to the claims made the basis of this lawsuit, the City of Houston and the Houston Police Department failed to adequately implement policies on, de-escalation, and alternatives to the use of deadly force. The failure to adequately implement policies reflects a deliberate indifference by the City of Houston, and the Houston Police Department to the rights of the City's inhabitants and is actionable under 42 U.S.C. § 1983.

131.    Plaintiff would show that the Defendants' actions were the result of or within the scope of, wrongful and reckless customs, policies, practices, and/or procedures and a toxic police culture for which the City of Houston and the Houston Police Department knew or should have known but never provided the requisite and proper training.

132.    For instance, the following conduct, policies, and customs, inter alia, by Defendants violated Dexter Ceasar's constitutional rights:

      a.    the City of Houston and Houston Police Department's failure to adequately train, supervise, or discipline its officers who commit a wrongful act or attempt to cover up a wrongful act of a fellow officer;

      b.    the City of Houston and Houston Police Department failed to maintain an adequate policy on the proper use of deadly force and alternatives thereto;

      c.    Using deadly force against Dexter Ceasar while he was talking on his phone, inside a non-moving vehicle, posing no threat to officers or others;

      d.    Maintaining a culture of police corruption that allowed police officers to feel that they can act without impunity through a pattern or practice of failing to adequately discipline and expurgate officers who violate policies and procedures

127.    In addition, Defendants, City of Houston and/or the Houston Police Department, as applicable, failed and refused to implement customs, policies, practices, or procedures, and failed to

train its personnel adequately on the appropriate policies, practices, or procedures regarding the proper use of deadly force and the investigation of its officers' actions after uses of force.

129.     In so doing, Defendants, City of Houston and/or the Houston Police Department knew that it was acting against the clear dictates of current law and knew that as a direct consequence of their deliberate decisions, the very situation that occurred in all reasonable probability would occur.

130.     The City of Houston and/or Houston Police Department's failure to properly supervise, train and discipline its officers was the proximate cause of the violations of the Plaintiffs' constitutional rights.

**Claim Number 4:** *Wrongful Death- 42 U.S.C. §1983 and Tex. CPRC §71.002-71.021 Against City of Houston and Officer Defendants*

131.  Plaintiff adopts and incorporates by reference each and every factual allegation throughout the complaint as though fully set forth herein.

132. Defendant Officer Jaime Vargas, Cameron Overstreet, and Jesse Seay's actions towards Mr. Ceasar violated Mr. Ceasar's constitutional rights and wrongfully caused the death of Mr. Ceasar, and without those actions, the death of Mr. Ceasar would not have occurred.

133. Prior to his death, Mr. Ceasar suffered serious personal injuries including but not limited to severe pain and emotional distress during the period after he was shot but before he died from the gunshot wounds of Defendant officers.

134. Plaintiff, Ms. Moore, suffered from pecuniary loss as a result of the wrongful death of Mr. Ceasar. Plaintiff, Ms. Moore also suffered loss of companionship and mental anguish as a result of the wrongful death of her young son,  Mr. Ceasar.

**Claim Number 5:** *Survival Action against City of Houston and Defendant Officers*

135.  Plaintiff adopts and incorporates by reference each and every factual allegation throughout the complaint as though fully set forth herein.

136. Defendants' actions towards Mr. Ceasar violated Mr. Ceasar's constitutional rights and wrongfully caused the death of Mr. Ceasar.

137. Prior to his death, Mr. Ceasar suffered serious personal injuries including but not limited to severe pain and emotional distress during the period after he was shot and before he died.

138. Plaintiff, as the mother of Mr. Ceasar, has standing to assert this claim pursuant to Tex. Civ. Prac. & Rem. Code Section 71.0004(a).

**Claim Number 6:** *Destiny Ceasar's Claim of Negligent Infliction of Emotional Distress under a Bystander theory against Defendant Officers*

139. Plaintiff adopts and incorporates by reference each and every factual allegation throughout the complaint as though fully set forth herein.

140.  28 U.S. Code § 1367 (a) allows district courts supplemental jurisdiction over state law claims when claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."

141. Texas common law allows for bystanders to recover for negligent infliction of emotional distress when a plaintiff can "establish that she (1) was located near the scene of the accident, as contrasted with one who was a distance away from it; (2) suffered shock as a result of direct emotional impact upon the plaintiff from a sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence; and (3) was closely related to the primary victim of the accident. *Merritt v. BP Prods. North Am., Inc.*, 2009 Tex. App.

LEXIS 6630, *5 citing *United Services Automobile Association v. Keith*, 970 S.W.2d 540, 541-42 (Tex. 1998).

142. Plaintiff Destiny Ceasar was the twin sister of Dexter Ceasar and closely related.

143. Plaintiff Destiny Ceasar was on the phone throughout the entire encounter between Defendant Officers. Plaintiff Destiny Ceasar was on the phone with her brother when Defendant Officer Jaime Vargas and Cameron Overstreet shot her brother and when Defendant Officer Jesse Seay shot the second can of tear gas into her brother's vehicle.

144. Plaintiff Desitny Ceasar arrived at the scene of the incident and saw her brother and his injuries at the scene as he was loaded onto an ambulance to be taken to the hospital.

145. As a result, Destiny Ceasar suffered emotional distress that manifested itself through physical symptoms such as severe stomach cramping in the days following, going into early labor, and difficulty sleeping. She also suffered mental injuries including memory loss, postpartum depression, anxiety, and fear of the police.

## **PRAYER FOR RELIEF**

Plaintiff seeks damages and injunctive relief for each of the causes of action alleged in this case against each defendant, in their individual capacities, for each defendant's intentional and purposeful intent to cause and deprive Plaintiffs and Dexter Ceasar  of constitutional rights under the Fourth Amendment and Due Process and Equal Protection of the Laws Clause, when each defendant acted under color of state law and/or employment, knowing that their acts and conduct was illegal, and deprived Dexter Ceasar of the safeguards and protections guaranteed and secured under the U. S. Constitution.

Plaintiffs asks for judgment against Defendants, any, or all of them, for the following:

    a.   Actual damages;

    b.   Pre-judgment and post-judgment interest;

    c.   Attorney's fees and expenses;

    d.   Punitive and exemplary damages in an amount to be determined;

    e.   Costs of Court; and

    f.   Permanent injunctive relief;

Plaintiff further asks that the City of Houston and the Houston Police Department be held liable for failing to create a structure and mechanism to ensure that this would not happen.

Plaintiff requests a declaratory judgment that Defendant City of Houston's policies and practices violate the Fourth Amendment rights against unreasonable search and seizure with respect to Mr. Ceasar.

Plaintiff also seeks injunctive relief, including, but not limited to:

    i.   Supervisory discipline up to and including termination for any employee or agent of the City of Houston or any other Defendant who engages in actions violating the Fourth Amendment.

    ii.   Grant such other and further relief as appears reasonable and just, to which Plaintiff may be entitled and may prevent future Constitutional violations by Defendants.

WHEREFORE PREMISES CONSIDERED, Plaintiff prays that following trial on the merits, judgment be rendered in favor of Plaintiff and against Each Defendant. Plaintiff also asks for any other relief that this court deems just and equitable under the law.

    Respectfully Submitted

    T.J. Solomon Law Group, PLLC

By: *Tanika J. Solomon*
Tanika J. Solomon
Texas Bar No. 24055713
Email:  attorney@tjsololaw.com
2120 Welch Street
Houston, TX 77019
Tel. (713) 640-5956
Fax. (713) 640-5944
**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

Certificate of Service I hereby certify that on October 18, 2024, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, So9uthern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this notice as service of this document by electronic means.

*Tanika J. Solomon*
Tanika J. Solomon